IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOSEPH IAN POPE, a minor, by    }
and through his mother and      }
next friend, Mary Helen         }
Clark,                          }        CIVIL ACTION NO.
                                }        05-AR-1264-S
        Plaintiff,              }
                                }
v.                              }
                                }
DEBRA ROULAIN, et al.,          }
                                }
        Defendants.             }


**MEMORANDUM OPINION**

Before the court are the motions for summary judgment of

defendant Shelby County, Alabama ("Shelby County"), and of

defendants Debra RouLaine ("RouLaine") and Alex Dudchock

("Dudchock").  RouLaine is Detention Manager of the Shelby County

Regional Juvenile Detention Facility (the "detention facility"),

and Dudchock is County Manager of Shelby County.  For the reasons

that follow, the motions are due to be granted.


*Factual Background*[1]

On January 17, 2004, minor plaintiff, Joseph Ian Pope

---

[1] Summary judgment is appropriate where the moving party demonstrates
that there is no genuine issue of material fact and that it is entitled to
judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v.
Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met
its burden, the court must view the evidence, and all inferences drawn
therefrom, in the light most favorable to the non-movant.  *Hairston v.
Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  In accordance
with this standard, the following statement of facts includes both undisputed
facts and, where there is a dispute, the facts according to plaintiff's
evidence.

("Pope"), was arrested by two Shelby County Sheriff's Deputies and charged as a minor in possession of alcohol.  At the time, he was 17-years old.  He was brought to the detention facility at approximately 12:30 a.m. on January 18, 2004.  His admissions documents were prepared by Officer David F. Reed ("Reed").  As part of the admission process, Reed required Pope to strip naked and then visually inspected him for lice, injuries or illnesses, self-inflicted wounds or suicide attempts, signs of drug or child abuse, and contraband.  Reed also sprayed a delousing chemical on Pope's body hair, including the hair on his head, underarms, and pubic region.  The admissions process was completed in approximately one hour.  The entire strip search and visual inspection lasted less than five minutes.  About three minutes were spent visually inspecting Pope for lice and applying delousing spray, and less than two minutes were spent conducting a visual body cavity search in which Pope was inspected for contraband and injuries.

The detention facility accommodates all levels of juvenile offenders, including violent offenders and persons accused of murder.  The detention facility is licensed by the Alabama Department of Youth Services ("DYS").  To maintain its DYS license, the facility must comply with the American Correctional Association Standards for Juvenile Detention Facilities ("ACA Standards").  The detention facility implemented several internal

policies to comply with various ACA Standards.  ACA Standard 3-
JDF-5A-02 requires detention centers to maintain "written
procedures for admission of juveniles new to the system,"
including a "[c]omplete search of the juvenile and possessions."
To comply with this ACA Standard, the detention facility followed
an internal policy numbered 5A-02 ("internal policy 5A-02")
specifying that a complete search of the juvenile and the
juvenile's possessions would be performed.

ACA Standard 3-JDF-3D-06-1 requires a "written policy,
procedure and practice" to "provide for the reporting of all
instances of child abuse and/or neglect consistent with
appropriate state law or local laws."  To comply with this
standard, the detention facility followed policy number 3D-06-1
("internal policy 3D-06-1"), which requires that all instances of
suspected child abuse and/or neglect be reported to authorities.
ACA Standard 3-JDF-4C-21 requires "a written policy, procedure
and practice" to "require medical, dental and mental health
screening to be performed by health-trained or qualified health
care personnel on all juveniles."  The detention facility's
policy numbered 4C-21 ("internal policy 4C-21"), titled the
"Physical Examination" policy, states that "a health screening
shall be performed by health-trained staff on all detainees being
admitted to the facility" and that the juvenile's behavior be
observed for several factors, including infestations.  Under the

3

heading "delousing," internal policy 4C-21 states that "each newly admitted detainee shall be examined for lice during the receiving screen performed by the Juvenile Detention Officer." All Juvenile Detention Officers at the detention facility are "health-trained" because they are trained on how to perform the admission health screening by the detention facility's nurse.

RouLaine interprets the above ACA Standards and internal policies, and specifically the "complete search" language, to mean that each juvenile must be ordered to strip naked; undergo a visual inspection for medical problems, signs of abuse and neglect, contraband, and lice; and be sprayed with delousing chemicals. In accordance with this interpretation, all juveniles arriving at the facility are first subjected to a fully clothed pat down, after which the intake process is completed. This process involves the admission officer's asking the juvenile questions and filling out paperwork. After the paperwork is complete, each juvenile who is to be placed in the general population[2] is instructed to strip naked for delousing.[3] The delousing process involves a visual inspection for lice and the

---

[2]Pope disputes defendants' characterization that he was placed in the "general population" in the sense of physically mingling with other inmates, noting that he was instead placed in a "pod," or a grouping of cells, that was next to but separate from other pods. The only inmates with whom he shared his pod were his co-defendants. However, it appears to the court that many, if not all, of the same concerns that justify searches for lice, contraband and injuries for those detainees who truly intermingle with the general population apply with equal force to detainees housed with their co-defendants in this type of pod arrangement.

[3]An exception is made for inmates who are extremely intoxicated.

application of delousing spray to areas of the body with hair,
including the head, armpits and genital region.  The visual
inspection and delousing is conducted by two officers of the same
sex as the juvenile, and the juvenile is not touched during the
delousing process.

After the delousing spray is applied, the detention facility
requires each juvenile detainee to undergo a visual body cavity
search.  Each juvenile is required to "perform a series of turns
and stand in a number of positions" so the juvenile can be
visually inspected for contraband and injuries, including signs
of abuse, self-inflicted injuries, or suicide attempts.  The
juvenile is required to stand in the middle of the room facing
the officer so the inspecting officers can check for injuries or
contraband.  If the juvenile is a male, he is instructed to lift
his genitals so the officer can ensure no objects are hidden
between his legs.  Each juvenile is then instructed to execute
two 1/4 turns so that the juvenile's back is facing the
inspecting officer.  The juvenile is then instructed to place his
or her hands on a bench, squat, and cough.  Next, the juvenile is
instructed to spread the cheeks of his or her buttocks, stand up
straight, lift each leg, and wiggle his or her toes.  To conclude
the inspection, the juvenile executes two additional 1/4 turns so
that the juvenile is again facing the officer.  The juvenile then
takes a shower before being issued clothing by the detention

facility.  This entire process takes approximately five minutes.
As detailed above, the search of Pope essentially conformed to
the detention facility's standard search procedures.

*Analysis*

The court is called upon to determine the constitutionality
of the procedure described above.  Pope seeks money damages under
42 U.S.C. § 1983, alleging that the search violated his rights
under the Fourth and Eighth Amendments to the U.S. Constitution.

The Eleventh Circuit has spoken separately on the
constitutionality of strip searches for delousing purposes and
strip searches for contraband.  However, the Eleventh Circuit has
not addressed the precise policy in question here, which involves
a combined delousing procedure and strip search for contraband
with what the parties acknowledge is no reasonable suspicion.  To
simplify the discussion, the court will separately examine the
constitutionality of the strip search for lice and the visual
body cavity search for contraband/injuries before assessing the
constitutionality of the combined search at issue here.

The Delousing Procedure

In *Skurstenis v. Jones*, 236 F.3d 678 (11th Cir. 2000), the
Eleventh Circuit reversed this court by holding that a strip
search for lice conducted by a male nurse's assistant on a female

6

inmate was constitutional.  The *Skurstenis* court held that the search was justified under the balancing analysis of *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979), because of the real threat that body lice would be transmitted among inmates and because the intrusion was "minimal," even though the search involved the male nurse's assistant running his fingers through the female inmate's body hair, including her pubic hair.  In the instant case, the search was conducted by an officer of the same sex as the juvenile being searched, and the search was less intrusive than the search in *Skurstenis* in that it was purely visual.  The inspecting officer did not run his fingers through Pope's body hair or touch Pope in any way.  However, there are two ways in which the search of Pope was more invasive than the search of Skurstenis.  First, Pope was a juvenile at the time he was searched, whereas Skurstenis was an adult.  Second, the search of Pope was conducted by a juvenile detention officer while the search of Skurstenis was conducted by a member of the medical staff.

There is a clear need to prevent lice from infesting detention facilities.  *See Skurstenis*, 236 F.3d at 683.  This need is the same whether the facility holds juveniles or adults. *Cf. Justice v. Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992) (noting that security dangers to an institution are the same whether the detainee is an adult or a juvenile).  But a strip

7

search is inevitably "thoroughly degrading and frightening" and a "serious intrusion upon personal rights." *Id.* at 192.   Juveniles "are especially susceptible to possible traumas from strip searches."  *Id.* (internal quotations omitted).   Thus, for *Bell* balancing purposes, the fact that a search involves a juvenile, rather than an adult, makes the intrusion more severe.

In addition, while no case specifically holds that a delousing search must be conducted by medical personnel, the fact that a strip search is conducted by an officer, rather than a medical professional or paraprofessional, is an "aggravating" factor contributing to the intrusiveness of the search.  *Bonitz v. Fair*, 804 F.2d 164, 172 (1st Cir. 2986), *overruled on other grounds by Unwin v. Campbell*, 863 F.2d 124 (1st Cir. 1988).   In *Skurstenis*, the Eleventh Circuit held that this court's concerns about a male running his fingers through a female detainee's pubic hair were ameliorated by the fact that the male was a nurse's assistant.  *Skurstenis*, 236 F.3d at 683 ("[T]he district court failed to give proper weight [] to the fact that the male was part of the medical staff of a hospital and was a nurses assistant.").   Moreover, *Skurstenis* held that it was reasonable for a strip search for lice to be conducted minutes before the detainee was released from custody because "the search was conducted at the first opportunity by medical personnel and was conducted the morning that Skurstenis was released only because

8

the medical personnel did not arrive until that time."
*Skurstenis*, 236 F.3d at 683 n.6.  In short, the cases make clear
that it is constitutionally preferable, though not necessarily
required, that strip searches for lice be conducted by medical
personnel.

This court concludes that *Skurstenis* is best read as
permitting the visual inspection for lice and the application of
delousing spray as conducted in the instant case.  If the exit
search of Skurstenis passed constitutional muster under the *Bell*
balancing analysis, the admission search here is also
permissible.  Both searches are justified by the same need to
keep lice out of the detention facility population.  And, taken
as a whole, the search in the instant case is comparably invasive
to the search in *Skurstenis*.  Though a search by a "health-
trained" judicial detention officer may be somewhat more invasive
than a search by a nurse's assistant, this is mitigated by the
fact that the search of Pope involved no physical contact and was
conducted by an officer of the same sex.  While the strip search
and application of delousing spray on the body hair of a 17-year
old by an officer of the same sex is undoubtedly traumatic, it
does not appear to be significantly more traumatic than the
search of an adult female detainee by a plain-clothes male who
repeatedly ran his fingers through her pubic hair.  Given the
nature of the lice check that was upheld in *Skurstenis*, the court

9

holds that the portion of the search of Pope that involved a
visual inspection for lice and the application of delousing spray
by a health-trained juvenile detention officer was not, by
itself, unconstitutional.

The Strip Search for Contraband and Injuries

     The court next turns to the question of whether the visual
body cavity search of Pope to inspect for contraband and injuries
was constitutional.  In its discussion, in *Skurstenis*, of an
independent contraband search, the Eleventh Circuit held that
Shelby County Jail Policy Number B-103 ("Shelby County Jail
policy"), which requires arrestees to undergo a "complete search"
prior to admission into the jail's general population, violated
the Fourth Amendment because it permitted strip searches of
detainees without reasonable suspicion.  The policies relied on
by the detention facility in the instant case, ACA Standard 3-
JDF-5A-02 and internal policy 5A-02, closely track the language
of the unconstitutional Shelby County Jail policy because they
provide for the "complete search" of newly admitted juveniles
without including any reasonable suspicion requirement.  Because
these policies allow strip searches with no reasonable suspicion,
the policies violate the Fourth Amendment.

     To be sure, a strip search conducted under an
unconstitutional policy does not necessarily violate the

10

detainee's constitutional rights.  In *Skurstenis*, the officers
had reasonable suspicion to strip search the plaintiff, even
though the Shelby County Jail policy under which they were
operating did not contain a reasonable suspicion requirement.
But in this case, the officers had no reasonable suspicion for
searching Pope.  Therefore, the strip search of Pope, as well as
the two policies authorizing the search, constituted an
unreasonable search and seizure under the Fourth Amendment.  *See
Wilson v. Jones*, 251 F.3d 1340 (11th Cir. 2001)

Defendants cite several cases in an attempt to cast doubt on
the continued applicability of the rule requiring reasonable
suspicion for strip searches, or at least to show that the state
of the law is sufficiently uncertain that the doctrine of
qualified immunity applies.  They quote *dicta* from *Evans v.
Stephens*, 407 F.3d 1272 (11th Cir. 2005), and *Hicks v. Moore*, 422
F.2d 1246 (11th Cir. 2005), indicating that some or most judges
on the Eleventh Circuit have reservations about the reasonable
suspicion requirement.  *Hicks*, 422 F.3d at 1251 n.5 ("We
personally question that [the practice of strip searching every
detainee who will be placed in the jail's general population]
violates the Fourth Amendment"); *Evans*, 407 F.3d at 1278 (en
banc) ("Most of us are uncertain that jailers are required to
have a reasonable suspicion of weapons or contraband before strip
searching – for security and safety purposes – arrestees bound

11

for the general jail population.").  But while *Evans* and *Hicks*
may indicate the Eleventh Circuit's willingness to reexamine the
reasonable suspicion requirement at some point in the future,
they do not alter the current law, which still requires
reasonable suspicion for strip searches.  Indeed, in *Hicks*,
decided more than three months after *Evans*, the court, despite
its expressed reservations, held that "[b]ecause we are overcome
by this Circuit's precedent, we must agree with the district
court that such a general practice [of strip searching all
detainees designated for the general jail population regardless
of reasonable suspicion], *for now at least*, is an unlawful basis
for the searches."  *Hicks*, 422 F.3d at 1246 (emphasis added).
This court is likewise overcome by Eleventh Circuit precedent,
and it cannot conclude that the detention facility's policy, or
the visual body cavity search of Pope, are constitutional.

    The court turns now to the affirmative defense of qualified
immunity.  "A government-officer defendant is entitled to
qualified immunity unless, at the time of the incident, the
preexisting law dictates, that is truly compels, the conclusion
for all reasonable, similarly situated public officials that what
Defendant was doing violated Plaintiffs' federal rights in the
circumstances."  *Marsh v. Butler County*., 268 F.3d 1014, 1030-31
(11th Cir. 2001) (internal quotations omitted).  At the time of
Pope's detention in January 2004, neither *Evans* nor *Hicks* had

been decided.  The governing cases were *Skurstenis* and *Wilson v. Jones*, 251 F.3d 1340 (11th Cir. 2001).  These cases were quite clear that a detention facility policy that provided for strip searching all newly admitted detainees without reasonable suspicion was unconstitutional.  *Skurstenis*, 236 F.3d at 680-82 ("This policy [Shelby County Jail Policy B-103], which does not require any reasonable suspicion, does not comport with the requirements of the Fourth Amendment."); *Wilson*, 251 F.3d at 1343 (The Shelby County Jail policy "violated the Fourth Amendment because it did not require reasonable suspicion as a predicate to strip searching newly admitted detainees.").

Indeed, the same analysis that supported a grant of qualified immunity to the Shelby County Sheriff in *Wilson* shows that RouLaine and Dudchock are not entitled to qualified immunity.  *Wilson* granted qualified immunity based in part on the existence of conflicting authority by Alabama district courts on the constitutionality of the Shelby County Jail policy.  But *Wilson* resolved this conflict, so the state of the law on this issue had been clarified by the time Pope was searched. Qualified immunity was also inapplicable in *Wilson* because a previously decided case, *Justice*, 961 F.2d at 190 (holding that a the strip search of a fourteen-year old based on reasonable suspicion was constitutional), was not "materially similar" because it involved a juvenile who was not to be put in contact

with the general inmate population, while *Wilson* involved a
detainee who was placed in a cell by herself but had limited
contact with other detainees.  This degree of contact was quite
similar to the level of contact Pope had with the general
population of the detention facility.  In fact, Pope arguably
posed more of a threat to the detention facility population than
did Wilson, since he was detained in a "pod" along with his co-
defendants, rather than in a private cell.  In short, if the
visual body cavity search of Pope is considered separately from
the delousing search, it was clearly unconstitutional at the time
it was carried out.  The preexisting law of *Wilson* and *Skurstenis*
were enough to plainly inform RouLain and Dudchock that such a
search violated Pope's Fourth Amendment right to be free from
unreasonable searches.


The Combined Delousing Procedure and Strip Search for Contraband

     Having considered separately the constitutionality of the
delousing search and the search for contraband, the court must
determine whether the combined delousing/visual body cavity
search of Pope violated his constitutional rights.  This double-
barreled search was conducted all at one time by the same
officers.  If Pope's rights were violated, the court must
determine whether the individual defendants are entitled to
qualified immunity on the combined search.

14

Defendants' strongest argument is that, given the constitutionality of the delousing portion of the strip search, the additional two minutes of the search that looked for contraband or injuries was not enough of an intrusion to make the search unconstitutional for *Bell* balancing purposes.  Pope was already, and constitutionally, required to completely disrobe for three minutes and to have his pubic region scrutinized as part of the lice search.  Defendants argue that the additional time Pope was required to spend naked was a relatively minor additional intrusion, and that it is more than outweighed by the combined needs of keeping the detention facility free of lice and contraband and of monitoring juvenile detainees for abuse.

The fact that Pope was required to remain naked a bit longer and to assume several positions that can only be described as awkward and humiliating undoubtedly constituted an additional intrusion.  Quantifying this humiliation is an extraordinarily difficult, if not impossible, exercise.  But the *Bell* analysis requires this court to weigh a search's intrusiveness against the need for the search, and this necessitates comparison with analogous cases.  While extremely invasive, requiring a person who is already naked to remain naked for an additional two minutes and assume awkward positions is less invasive than ordering an otherwise clothed person to disrobe and assume the same positions.  In this respect, the visual body cavity search

15

here, though intrusive, was at least marginally less intrusive than the contraband searches in *Skurstenis* and *Wilson*.  However, as discussed *supra*, this case involves a juvenile, which makes the search significantly more intrusive.  At the same time, the need for the search here is greater than the need for the visual cavity searches in *Skurstenis* and *Wilson* because the goal of seeking contraband is now combined with the goals of keeping lice from infesting the detention facility and of checking a juvenile for signs of abuse, whether self-inflicted or inflicted by someone else.

This court has previously been reversed in its application of the Fourth Amendment balancing analysis in a strip search case, and it confesses some difficulty in discerning which outcome is mandated by *Bell* in this case.  Ultimately, the court returns to the fact that, under the current law of the Eleventh Circuit, visual body cavity searches for contraband conducted without reasonable suspicion violate the Fourth Amendment.  Case law indicates that this is particularly true when the individual being searched is a juvenile.  Here, a juvenile detainee underwent a visual body cavity search for contraband with no reasonable suspicion.  Absent a directive from the Eleventh Circuit, this court cannot find such a search constitutional.  Thus, the court finds that, taken in its entirety, the search of Pope violated his Fourth Amendment right to be free from

unreasonable searches because he was forced to undergo a visual
body cavity search without reasonable suspicion.

Therefore, the court must turn to the qualified immunity
issue for RouLaine and Dudchock with respect to the overall
search.  Although the law requiring reasonable suspicion as a
predicate for strip searches for contraband was plainly
established at the time Pope was searched, the
unconstitutionality of the combined search for lice and
contraband was not any more clear to these officers than it was
to this court.  It may not be clear today, as evidenced by this
court's difficulty in applying the *Bell* analysis.  In other
words, the controlling precedents of *Skurstenis* and *Wilson* did
not truly compel the conclusion that the combined strip search
violated Pope's constitutional rights.  For these reasons,
RouLaine and Dudchock are protected by qualified immunity and,
accordingly, are entitled to summary judgment.


The Liability of Shelby County

Having held that the search of Pope violated his Fourth
Amendment right to be free from unreasonable search and seizure,
the court must now decide whether Shelby County, which cannot
assert qualified immunity as a defense, can be held liable for
the violation under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,
98 S. Ct. 2018 (1978).  According to *Monell*, a government entity

17

can only be held responsible under § 1983 "when execution of
[the] government's policy or custom, whether made by its
lawmakers or by those whose edicts or acts may fairly be said to
represent official policy, inflicts the injury." *Id.* at 694.  In
other words, "a municipality cannot be held liable *solely* because
it employs a tortfeasor -- or, in other words, a municipality
cannot be held liable under § 1983 on a *respondeat superior*
theory." *Id.* at 691.  Here, Pope claims that the strip search of
all detainees at the detention facility amounted to a county
policy, while Shelby County maintains that no Shelby County
policy caused the search of Pope.

This is a fairly complicated question that has not, to this
court's knowledge, been precisely addressed.  Previous cases
offer some guidance in the context of actions by county sheriffs,
*see, e.g., Turquitt v. Jefferson County*, 137 F.3d 1285 (11th Cir.
1998), but their applicability is limited due to a number of
factors, including the special role that sheriffs have as state
executive officers under the Alabama Constitution.  This role is
not shared by county managers or detention center managers.
However, *Turquitt*'s analysis is also based on the fact that
Alabama counties only have those powers explicitly granted by the
legislature.  *Id.* at 1289; *Tuscaloosa County v. Ala. Great S.
R.R. Co.*, 150 So. 328, 331 (Ala. 1933).  Thus, "absent an express
delegation from the legislature, we must look to the Alabama

18

Code" to determine a county's role in operating a jail. *Turquitt*, 137 F.3d at 1289.  Similarly, this court looks to the Alabama Code to assess the role of counties in the administration of juvenile detention facilities.

Alabama counties do have an important role in the administration of juvenile detention facilities.  The Alabama Code specifically authorizes counties and incorporated municipalities to form public nonprofit corporations to provide temporary care and custody of youths who have been placed under the jurisdiction of the juvenile courts.  ALA. CODE § 44-3-2 (1975).  Juvenile facilities and programs are under the control and direction of the boards of directors of these corporations. ALA. CODE § 44-3-10 (1975).  The governing bodies of counties or municipalities, including county commissions, may be admitted to membership in the corporation and represented on the board of directors.  ALA. CODE § 44-3-8 (1975).  In other words, DYS-licensed juvenile detention centers like the Shelby County Regional Juvenile Detention Center are "public corporations...that are the *responsibility of the county* or [in some cases] several cooperating, or 'member,' counties."  *Coosa Valley Youth Servs. Corp. v. Etowah County,* 460 So. 2d 1232, 1233 (Ala. 1984) (emphasis added).

Nevertheless, the Alabama Code curtails its grant of authority to the counties in at least two ways.  First, it

19

requires a license to operate a juvenile detention facility,
specifically noting that "no county or city in the state...shall
establish, maintain or operate any detention facility or any
foster care facility for youths found delinquent or in need of
supervision by a juvenile court without a license" from DYS.
ALA. CODE § 44-1-27(b) (1975).  Second, it conditions the license
on certain DYS-established minimum standards.  The Code directs
DYS to "establish and promulgate reasonable minimum standards for
the construction and operation of detention facilities," ALA. CODE
§ 44-1-27(a) (1975), and requires DYS to "revoke the license of
any city [or] county...that fails to meet the standards
prescribed by [DYS]."  ALA. CODE § 44-1-27(c) (1975).  DYS is a
"department of the state" under ALA. CODE § 44-1-20 (1975), and
one of the minimum standards for licensure it has established is
compliance with the ACA Standards.  ALA. ADMIN. CODE r. 950-1-5.01
(2005).  One of these ACA Standards, ACA Standard 3-JDF-5A-02,
requires juvenile detention facilities to establish a written
policy providing for a "complete search" of admitted detainees.
No reasonable suspicion requirement is included in the ACA
Standard.  Thus, it is the State of Alabama, not Shelby County,
that is the source of this particular unconstitutional policy,
via the minimum standards promulgated through the state's
Department of Youth Services.  Shelby County was required by the
state of Alabama to follow an unconstitutional policy as a

20

condition of maintaining a juvenile detention facility.  Thus, this may not be fairly said to constitute a Shelby County policy under *Monell*.  Because it was not Shelby County's policy, Shelby County's motion for summary judgment is due to be granted.

*Conclusion*

For the reasons above, both motions for summary judgment will be granted by separate order.

DONE this 19th day of June, 2006.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE